# EXHIBIT 7

## *SUPREME COURT OF THE STATE OF CALIFORNIA*

In re

IGNACIO PENA,

        Petitioner,

        On Habeas Corpus.

_____/

BOARD OF PRISON TERMS, ARNOLD
SCHWARZENEGGER, Governor,

        Real Parties In Interest.

_____/

**Case No.**

[Santa Clara Co. Sup. Ct. Case # 96973;
6th District Court of Appeal Case #H029497]

---

### PETITION FOR REVIEW

---

STEVE M. DEFILIPPIS, Esq.
State Bar #117292
TRACI S. MASON, Esq.
State Bar # 237663
PICONE & DEFILIPPIS, A P.L.C.
625 N. First Street
San Jose, CA 95112
(408) 292-0441

Attorneys for Petitioner,
IGNACIO PENA

TABLE OF CONTENTS............................................................................i

TABLE OF AUTHORITIES........................................................................iii

PETITION FOR REVIEW..........................................................................1

INTRODUCTION.................................................................................1

     ISSUES PRESENTED FOR REVIEW.....................................................3

     NECESSITY FOR REVIEW..............................................................3

     STATEMENT OF THE CASE.............................................................4

     LEGAL ARGUMENT....................................................................6

I.    WHEN A CASE ARISES FROM A PLEA BASED CONVICTION, THE PRINCIPLES ENUNCIATED IN DANNENBERG DO NOT APPLY, AND THE CASE IS CONTROLLED BY BROWN V. POOLE AND PENAL CODE SECTION 1192.1............................................6

II.   UNLIKE DANNENBERG, THE BOARD'S CONSIDERATION & TREATMENT OF THE CRIME IS GOVERNED BY THE TERMS OF THE PLEA CONTRACT........................................................10

III.  WHERE A PRIMA FACIE SHOWING IS MADE IN THE ALTERNATIVE OF AN INVOLUNTARY PLEA, OR BREACH OF A PLEA AGREEMENT, AN EVIDENTIARY HEARING IS REQUIRED TO RESOLVE THE FACTUAL DISPUTES..............................14

IV.  THE BOARD OF PRISON TERMS DEPRIVED MR. PENA OF HIS FEDERALLY PROTECTED LIBERTY INTEREST AND VIOLATED HIS 5th AND 1 4th AMENDMENT RIGHT TO DUE PROCESS BY MAKING FINDINGS AND DECISIONS UNSUPPORTED BY SOME RELEVANT, RELIABLE EVIDENCE....................................16

     A. THE BOARD'S CONCLUSION THAT MR. PENA POSES AN UNREASONABLE RISK OF DANGER TO THE PUBLIC DUE TO THE NATURE OF HIS COMMITMENT OFFENSE IS NOT SUPPORTED BY SOME RELIABLE EVIDENCE...............17

     B.   MR. PENA'S PAROLE DENIAL IS NOT SUPPORTED BY ANY NON-OFFENSE FACTOR....................20

i

C.    THE BOARD IS USING THE WRONG STANDARD TO EVALUATE CDC 115 VIOLATIONS FOR PAROLE SUITABILITY...............................................22

V.    THE UNITED STATES SUPREME COURT DECISIONS OF APPRENDI AND BLAKELY PROHIBIT ANY SENTENCING AUTHORITY FROM IMPOSING GREATER PUNISHMENT THAN THAT AUTHORIZED BY THE FACTUAL FINDINGS MADE BY THE TRIER OF FACT........................................................23

VI.   THE BOARD'S REPEATED RELIANCE ON THE COMMITMENT OFFENSE VIOLATES DUE PROCESS................................26

VII.  THIS COURT'S INTERPRETATION OF THE ACTIONS BY THE LEGISLATURE AS DESCRIBED IN DANNENBERG RESULTS IN AN UNCONSTITUTIONAL RETROACTIVE LEGISLATION, WHICH DIRECTLY IMPAIRS THE CONTRACTUAL AGREEMENT BETWEEN THE STATE AND MR. PENA.................................29

PRAYER..................................................................................35

CERTIFICATE OF WORD COUNT ................................................................36

FEDERAL CASES

Anderson v. Yungkau (1947) 329 U.S. 482, 485                                         32
Apprendi v. New Jersey (2000) 530 U.S. 466                                       25, 26
Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910                                 23, 30, 33
Blakely v. Washington, (2004) 542 U.S. 296                                           26
Board of Pardons v. Allen, (1987) 482 U.S. 369                                       33
Brady v. United States (1970) 397 U.S. 742                                       13, 17
Brown v. Poole (9th Cir. 2003) 337 F.3d 1155                                     15, 28
Corbitt v. New Jersey (1978) 439 U.S. 212                                            18
Dartmouth College v. Woodward, (1819) 17 U.S. 518                                    32
Esco v. Zerbst (1935) 295 U.S. 490                                                   32
Giglio v. U.S. (1972) 405 U.S. 150                                                   14
Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, (1979) 442 U.S. 1           33
Hill (1985) 472 U.S. 445                                                             29
Home Guilding & Loan Association v. Blaisdell, (1934) 290 U.S. 398               32, 33
Irons v. Warden (E. D. Cal. 2005) 358 F.Supp.2d 936                              30, 31
Jones v. Smith (9th Cir. 2001) 231 F.3d 1227                                         26
Lanzetta v. New Jersey (1939) 306 U.S. 451                                           20
McQuillion v. Duncan [McQuillion I] (9th Cir. 2002) 306 F.3d 895              32, 33, 34
Newman v. Chater (1996) 87 F.3d 358                                                  17
Santobello v. New York (1971) 404 U.S. 257                                           16
Schwartzmiller v. Gardner (9th Cir. 1984) 752 F.2d 1341                              22
Stirone v. United States (1960) 361 U.S. 212                                         26
Thompson v. Davis (9th Cir. 2002) 282 F.2d 780                                       23
Tidal Oil v. Flanagan, (1924) 263 U.S. 444                                           35
U.S. v. Bakshinan (1999) 65 F.Supp.2d 1104                                           14
United States v. Anderson (9th Cir. 1992) 970 F.2d 602                               34
United States v. Castro-Cervantes (9th Cir. 1990) 927 F.2d 1079                      18
United States v. De La Fuente (9th Cir. 1993) 8 F.3d 1333                            34
United States v. Doremus (9th Cir. 1989) 888 F.2d 630                                22
United States v. Kellar (9th Cir. 1990) 902 F.2d 1391                                34
Webber v. Crabtree (1998) 158 F.3d 460                                               32
Williams v. Taylor (2000) 529 U.S. 420                                               16

STATE CASES

Bank of West v. Superior Court (1992) 2 Cal. 4th 1254                                17
Cunningham, supra, 49 Cal.App.4th 1044                                           14, 34
Ernest Smith (2003) 114 Cal.App.4th 343                                          21, 29
Ghirardo v. Antonioli (1994) 8 Cal.4th 791                                           28
In re Dannenberg (2005) 34 Cal.4th 1061                                          passim
In re Mark Smith (2003) 109 Cal.App.4th 489                              20, 23, 24, 25
In re Ramirez (2001) 94 Cal.App.4th 549                                           34,36
In re Roberts (2005) 36 Cal. 4th 575                                                 27
In re Rosenkrantz [Rosenkrantz V] (2003) 29 Cal.4th 609                    4, 15, 19, 20
In re Scott [Scott I] (2004) 119 Cal.App.4th 871                                     29

In re Scott [Scott II] (2005) 133 Cal.App.4th 573                          28
In re Sena (2003) 94 Cal.App.4th 836, at 839                              27
People v. Black (2005) 35 Cal.4th 1238                                    28
People v. Cimarusti (1978) 81 Cal. App. 3d 314                        13, 14
People v. Collins [Collins I] (1978) 21 Cal. 3d 208                       13
People v. Collins [Collins II] (1996) 45 Cal.App.4th 849                  13
People v. Harvey (1979) 25 Cal.3d 754                              7, 12, 15
People v. McCaughan (1957) 49 Cal.2d 409                                  20
People v. Orin (1975) 15 Cal. 3d 937                                      13
People v. Toscano (2004) 124 Cal. App. 4th 340                            17
Superior Court of Santa Clara v. Engert (1982) 31 Cal.3d 797             22

STATUTES

Penal Code §1192.1                                                  8, 9, 10
Civil Code §1654                                                          17
Penal Code §1192.5                                                       14
Penal Code §3041                              20, 29, 31, 34, 35, 36
U.S. Const. Art. I                                                   32, 35
Pen. Code §1192                                                          14
Pen. Code §1192.1                                                    10, 14
Pen. Code §3041(a)                                                       26
Pen. Code §3041(b)                                                       27


STATE REGULATIONS

Cal. Code Regs., tit. 15, § 2410                                     24, 34

STEVE M. DEFILIPPIS, Esq.
State Bar #117292
TRACI S. MASON, Esq.
State Bar # 237663
PICONE & DEFILIPPIS, A P.L.C.
625 N. First Street
San Jose, CA 95112
(408) 292-0441

Attorneys for Petitioner,
IGNACIO PENA

## SUPREME COURT OF THE STATE OF CALIFORNIA

In re

IGNACIO PENA,

      Petitioner,

      On Habeas Corpus.
_____/

BOARD OF PRISON TERMS, ARNOLD
SCHWARZENEGGER, Governor,

      Real Parties In Interest.
_____/

**Case No.**

[Santa Clara Co. Sup. Ct. Case # 96973;
6th District Court of Appeal Case #H029497]

*PETITION FOR REVIEW*

### INTRODUCTION

This case presents a Petitioner who entered into a plea contract with the State, abided by all terms of the agreement, has programmed exceptionally well and yet has four (4) times been denied parole after serving twenty two (22) years on a second degree murder. The facts of this case are such as to preclude the Board from now stating that the crime was so egregious that a date cannot be given after such a long period of time. Despite this, and in the face of clear evidence of rehabilitation, the Board continues to rely on the crime to deny parole. As such, this case clearly demonstrates the arbitrariness with which parole hearings are conducted, and the lack of consistent standards under

1

which suitability is evaluated. Thus, the Board's denial squarely presents the issue of how a plea based term to life conviction must be treated in the parole consideration process, in light of the various principles of federal constitutional law that arise due to this Court's analysis under *In re Rosenkrantz [Rosenkrantz V]* (2003) 29 Cal.4[th] 609 and *In re Dannenberg* (2005) 34 Cal.4[th] 1061.

Here, Petitioner Ignacio Pena factually established in the courts below that his plea agreement contemplated releasing him at the expiration of his minimum term, and barred the use of the commitment offense as a factor of unsuitability.[1] While this understanding had clearly been breached, the courts below seemed to lack an understanding of how the contractual relationship involved in a plea based case requires a differing analysis than the *Rosenkrantz\Dannenberg* formulation, and then failed to even apply that test correctly, concluding that the Board is allowed to rely on facts not specifically reflected in, or part of, the plea agreement. The lower courts also found that the Board's decision could be upheld if the crime could be said to be based on more than the minimum necessary to sustain a conviction, even though not meeting the regulatory factor of being "especially heinous, atrocious and cruel."

As will be seen, however the issue is viewed when the underlying conviction is based on a jury verdict, in the context of a plea, the approach offered in *Dannenberg* just simply does not apply, due to the contractual nature of the relationship between the inmate, the court and the State. Thus, even if this Court does not decide to re-think the position articulated in *Dannenberg* generally, a new approach must be developed in the plea context.

---

[1] During the plea colloquy, defense counsel asked that there be assurances from the court "...to re-affirm the possibilities of [the defendant] getting good time, good behavior time, lessening the seventeen years *to actual time that he is going to do of less than seventeen years,* if he complies with the rules once he is sentenced, I think that he wants to hear that from the Court..." (Exh. C, pp. 3, 5 emphasis added.) The court affirmed that this was how the sentence would work, stating "...*that's what the law is.* It's written right there in the book." (Exh. C, p. 6, emphasis added.) Thus, Mr. Pena naturally concluded that he would serve "actual time" of less than 17 years.

### ISSUES PRESENTED FOR REVIEW

I.    CAN THE BOARD TREAT AN OFFENSE AS BEING MORE SERIOUS THAN THE CRIME TO WHICH THE INMATE PLED GUILTY WITHOUT VIOLATING THE TERMS OF THE PLEA AGREEMENT?

II.   WHERE AN INMATE MAKES OUT A PRIMA FACIE CASE OF BREACH OF A PLEA CONTRACT, IS AN EVIDENTIARY HEARING REQUIRED TO DEVELOP THOSE FACTS?

III.  WHERE AN INMATE'S UNDERSTANDING OF THE TERMS OF HIS PLEA DIFFERS FROM THE COURT'S DETERMINATION OF THOSE TERMS, IS THE PLEA INVOLUNTARY?

IV.   DOES A PETITIONER'S IMPRISONMENT BECOME CONSTITUTIONALLY DISPROPORTIONATE UNDER FEDERAL LAW BASED ON THE FAILURE TO SET A DATE FOR RELEASE WHEN THE PETITIONER SERVES A TERM SPECIFIED FOR MORE SERIOUS CRIMES?

V.    IS THE BOARD'S "ESPECIALLY HEINOUS, ATROCIOUS, AND CRUEL" LANGUAGE OF THE REGULATIONS GOVERNING PAROLE UNCONSTITUTIONALLY VAGUE?

VI.   DOES THE REFUSAL TO HONOR MR. PENA'S UNDERSTANDING OF THE TERM HE WOULD SERVE ALTER THE STATE'S CONTRACTUAL DUTIES TO HIM SUCH THAT THE CONTRACTS CLAUSE OF THE U.S. CONSTITUTION IS VIOLATED?

VII.  DO THE FINDINGS THAT THE BOARD MADE REGARDING MR. PENA'S CRIME VIOLATE THE RIGHT TO A JURY TRIAL UNDER THE *APPRENDI-BLAKELY*[2] RULE [FINDINGS WHICH TAKE A CASE OUT OF THE ORDINARY SENTENCE RANGE MUST BE PROVEN OR ADMITTED]?

VIII. WHERE A PATTERN DEVELOPS OF IMPROPER DENIALS BASED UPON A POLICY OF THE EXECUTIVE BRANCH IN VIOLATION OF THE STATUTORY MANDATE THAT PAROLE SHALL NORMALLY BE GRANTED, IS THE INMATE DENIED FEDERAL DUE PROCESS?

### NECESSITY FOR REVIEW

The issues raised by this petition fall squarely under California Rule of the Court 29(a)(1) in that they are of statewide import, in a rapidly evolving area of law, raising significant constitutional issues that are applicable to the large number of habeas corpus proceedings that are currently pending in the courts throughout the state challenging denials of parole.   For the reasons discussed at length herein, it is respectfully submitted that the

---

[2] *Apprendi v. New Jersey* (2000) 530 U.S. 466; *Blakely v. Washington*, (2004) 542 U.S. 296.)

*Dannenberg* decision needs to be re-evaluated, or at the very least, an exception carved out for plea based cases, and the questions presented herein need to be resolved in order to assist trial courts in deciding future habeas petitions.

### STATEMENT OF THE CASE

Petitioner Ignacio Pena is a California State Prison inmate who has served twenty two years on a seventeen (17) year to life sentence for second degree murder. It is clear from the submissions, particularly the transcript of the plea and pre-plea discussions, that Mr. Pena was led to believe that he would be released after serving only two-thirds of the minimum term, yet he has been in custody for nearly twice that long, and has served a sentence, with applicable credits, of nearly thirty (30) years, putting him at or above 38 of the 48 matrix terms for the greater offense of first degree murder. Additionally, Mr. Pena has been through a series of four (4) *parole denials*, with the true rationale always being that the crime, by itself and in the face of evidence of rehabilitation, makes him an unreasonable risk of danger to society if paroled.

While serious, the offense conduct attributable to Mr. Pena had specific characteristics that dramatically lessened its tendency to show particular dangerousness on his part. For example, Mr. Pena was young, intoxicated, believed the victim to be armed[3] and also believed that the victim was potentially quite violent, as he had previously shot Petitioner's uncle. Thus, while certainly serious in the way that any second degree murder would be, the conduct of Mr. Pena certainly did not show an exceptionally callous disregard for suffering

Mr. Pena's attorney negotiated a plea agreement with the prosecutor, in which he pled guilty to the murder, with the prosecution's stipulation that the offense was a murder of the second degree, and all allegations of first degree murder were dismissed. During the plea colloquy, defense counsel stated on the record that Mr. Pena understood that he would serve "actual time" on the sentence of less than 17 years, based on receiving credits against his minimum term. The court confirmed that this was law, and at no time

---

[3] In fact, either the victim, or someone from the victim's group fired a shot at Mr. Pena as he fled the scene.

4

did either the court or prosecutor attempt to state that the actual term would be anything other than the 12 to 17 years discussed on the record.   After accepting the plea, the court sentenced Mr. Pena to a total term of 17-years-to-life in State prison. As a result of this discussion on the record, at the time Mr. Pena entered into the agreement, he had the following express understanding:

1. That the crime for which he was sentenced was parole eligible;
2. That he pled guilty to an offense that he understood to be considered less serious than the original charges, and the lowest level of murder;
3. That the crime itself would not be an impediment to parole, and that the agreed reduction in the charge by the D. A's Office was meant to reflect the State's position that this was a crime of lesser culpability than as originally charged, and that the state would not attempt to re-characterize the offense as being more serious;
4. That the crime would be treated by everyone concerned as second degree murder, and not as a first degree offense; and
5. That, because of the foregoing factors, even though the actual sentence was to be stated as 17 years to life, Mr. Pena would be released at between twelve (12) and seventeen (17) years, depending on how he programmed in prison.

    This left him with the clear understanding that he would serve a term of definite years, with the only question being whether he would earn good time\work time credits to reduce the term from seventeen (17) to twelve (12) years.   Thus, release was a certainty, and he even held the key to his earlier release, as long as he programmed well. He also fully expected the District Attorney's office to honor their promise to treat the offense as a second degree murder. The intent of the parties involved the defendant, Mr. Pena, negotiating for early release in exchange for the prosecution obtaining the certainty of a conviction and avoiding a long and costly trial.   Likewise, the parties were contemplating a release consistent with the minimum term, as reduced by applicable credits, and did not view the crime as an impediment to parole.   In fact, by dismissing the first degree allegations, the prosecution made it clear that it viewed this case as not deserving of the more extended punishment that would flow from obtaining a conviction in the higher degree. The law is explicit that a defendant cannot be punished for charges

or allegations that are dismissed, absent an express agreement to the contrary. (*People v. Harvey* (1979) 25 Cal.3d 754, 762.)

However, as had occurred at the prior three (3) hearings, at the November 18, 2002 proceeding, the Board Panel once again denied Mr. Pena parole by relying predominately on the commitment offense. (See Resp.'s Exh. A, pp. 001-007.) The Board characterized the crime as being "carried out in an especially cruel and callous manner" and a "dispassionate and calculated manner," and concluded that it showed an "exceptionally callous disregard for human suffering." (Resp.'s Exh. A, p. 001.) Despite the lack of true evidence of unsuitability, the superior court denied relief, as did the Court of Appeal. Mr. Pena believed that the superior court was a party to this agreement and would honor it in all respects. Thus, if he was not in fact released by the Board, Mr. Pena believed that the Superior Court would grant him the necessary relief to insure that he received the benefit of the contractual arrangement that he entered into with the State. Thus, he pursued a petition for writ of habeas corpus at the superior court level. In that petition, Mr. Pena argued that the State had wrongfully denied him the benefit of his plea bargain, which expressly contemplated treatment of the conviction as a second degree murder, with a term of between twelve (12) and seventeen (17) years. However, the Superior Court denied the petition. Similarly, the Court of Appeals summarily denied relief.

### LEGAL ARGUMENT

**I.   WHEN A CASE ARISES FROM A PLEA BASED CONVICTION, THE PRINCIPLES ENUNCIATED IN DANNENBERG DO NOT APPLY, AND THE CASE IS CONTROLLED BY BROWN V. POOLE AND PENAL CODE SECTION 1192.1.**

Petitioner is requesting this Court to review how a plea based conviction must be treated in a significantly different fashion than a jury verdict, due to the contractual nature of the relationship between the defendant, the state and the court. The

6

*Dannenberg*[4] case arose out of a jury trial, where the petitioner had been convicted of second degree murder. Conversely, the present case involved the prosecution offering that if the defendant pled guilty, they would stipulate that the murder was in the second degree, and not of the first degree. Obviously, this also included the express determination that Mr. Pena would be parole eligible. Prior to the state making this offer, Mr. Pena and his attorney engaged in a colloquy with the trial court to determine what the sentence would be. While the court seemed to simply want to simply say that the law was as it read, and leave it at that, the judge made no effort to correct defense counsel's statements, telling the defendant the following:

> "Mr. Hernandez: I think that ...*We have explained to our client certain things* in terms of the degrees and the time and type of ... *The terms and punishment that apply to second-degree.* I think he has some certain questions that he wanted us to clarify, both with the people and with the Court for him.
>
> ...
>
> Mr. Hernandez: Your Honor, I think that I have explained basically to my client to my client the laws applied under Article 2.5 and §§2930-34 of the Penal Code having to do with time and the reduction of time once he is sentenced or once he sent to the Department of Corrections System. I think that in order to solidify my explanations to him, if the Court would be willing to re-affirm the possibilities of him getting good time, good behavior time, *lessening the seventeen years to actual time that he is going to do of less than seventeen years, if he complies with the rules once he is sentenced,* I think that he wants to hear that from the Court in order to be reassured that that is the policy. Not so much that its guaranteed, but that that is the policy that –that if his behavior is good and he cooperates with the prison system in terms of his good time/work time that he will be given the benefit of. (Exh. C, pp. 3, 5 emphasis added.)

Clearly, a lay person such as Mr. Pena[5] would have understood from Mr. Hernandez's statements that he was going to serve an actual term of seventeen years, but that if he stayed free of discipline in the prison, that term would be reduced and he would serve two thirds of the seventeen years. Neither the trial court nor the District Attorney

---

[4]  *In re Dannenberg* (2005) 34 Cal. 4th 1061.

[5]  Mr. Pena spoke only Spanish, and could not read or write in English. He had completed only the sixth grade in Mexico and had no other formal education. (Exh. C, p. 12.)

7

did anything to dispel that notion that the actual term would be seventeen (17) years or less. In fact, the trial court actually affirmed this representation, stating, "[*T]hat's what the law is*. It's written right there in the book." (Exh. C, p. 6, emphasis added.)  Again, the deputy District Attorney did nothing to challenge these representations. (*Id*.) Thus, both the DA and court allowed the plea to be entered with that express understanding of how the sentence would be served.  It was with that understanding permeating the proceedings that the DA stipulated that the murder was of the second degree, not of the first, and the court accepted that stipulation and so determined the degree.  Of course, by proceeding in this fashion, the District Attorney and trial court agreed to become parties to, and be bound by, the plea.

The *Dannenberg* case states principles that are applicable to a situation where there is no plea contract, and nothing binding the state to treat the offense in a particular fashion.  Here, the result of the plea was a binding contract within the meaning of *Brown v. Poole, supra,* with the state thereafter bound to treat the offense as a second degree murder for all purposes (see *Pen. Code* §1192.1), and with the application of certain legal principles that require early release of Petitioner, at between 12 to 17 years depending on his programming. (*Buckley v. Terhune* (9th Cir. 3/17/06) __ F.3d __ [2006 WL 679823].)

In both *Poole* and *Buckley*, the court found that the petitioner had certain understandings and expectations at the time of entering the plea, which necessarily arose as a result of the specific statements made by the district attorney. In each case, the actual sentence was 15 years to life, the standard second degree murder sentence, but the defendants each had a discrete understanding of when they would be released within the outside parameters set by the imposed term. In *Poole*, the representation was that she would serve two thirds of the minimum term, ten (10) years.  In *Buckley*, he was led to believe he was receiving a term of fifteen (15) years. Here, similar expectations existed, directly due to the representations made by Mr. Pena's trial counsel, Daniel Hernandez, that he would be released after serving two thirds of the seventeen (17) year minimum term. The court interjected that this representation of the "actual time" to be served was "...*what the law is*. It's written right there in the book." (Exh. C, p. 6, emphasis added.)

8

The deputy district attorney did nothing to dispel this understanding of the actual term. Furthermore, the State had negotiated a disposition of the case that required the treatment of the case as a second degree murder, which made it clear that the actual time served would be less than a first degree murder, and accepted the benefits of this disposition knowing that the defendant believed he would serve no more than two thirds of seventeen (17) years. Obviously, a reasonable person in the position of Mr. Pena would understand the representations of his lawyer, and the colloquy with the court, to mean that the state was acquiescing in the understanding he had of how his sentence would be executed. This left the offense with a stated term of seventeen (17) years, which he directly understood he could further reduce by performing well in prison, and that he would thus get released upon serving two thirds of that minimum term.

The application of the principles of *Buckley* and *Brown v. Poole* to this case rests on a very different evidentiary foundation than the type of Board of Prison Terms determination that is made at a hearing and addressed in *Dannenberg* These are factual findings in a habeas corpus proceeding that are based upon the evidentiary submissions made by the parties. It is not an evidentiary review of the sufficiency of the showing made in a Board of Prison Terms hearing. Thus, the analysis in *Dannenberg* has no application here. For example, as can be seen from even a cursory review of the *Brown v. Poole* decision, under federal due process principles, that court did not conduct any type of "some evidence" review in connection with evaluating that petitioner's claim. Nor is this Court required to do so here. Instead, it is incumbent on this Court to ascertain the understanding of Mr. Pena at the time of the plea, based on the plain and clear statements of counsel and the court, acquiesced in by the prosecutor, and to give effect to the reasonable expectation of the Defendant as to how long he would serve. Of course, if he holds the beliefs discussed herein as to his actual sentence length, but that understanding does not accurately reflect the terms of the plea bargain, Mr. Pena never entered into a free and voluntary plea agreement. In essence, this issue raises the same considerations as would a motion to withdraw plea, except that, since the Defendant has fully performed his obligations under the plea contract, the remedy is specific

performance in accordance with *Buckley* and *Brown*, not withdrawal of the plea. Here, the uncontradicted statements in the trial record proffered by Petitioner establish each of the relevant facts upon which relief is proper.

Accordingly, the principles of *Dannenberg* cannot be applied here, and the case is governed by the decisions of the Ninth Circuit in *Buckley* and *Brown v. Poole, supra,* and under the provisions of *Pen. Code*§1192.1.

## II. UNLIKE DANNENBERG, THE BOARD'S CONSIDERATION & TREATMENT OF THE CRIME IS GOVERNED BY THE TERMS OF THE PLEA CONTRACT.

Here, the manner in which the crime is to be treated in any Board of Prison Terms hearing for Mr. Pena is governed by the terms of the plea contract. Unlike the situation in *Dannenberg,* where the state did not contractually bind itself to evaluate the crime in a particular manner, here, the state did precisely that, by entering into a binding contract to treat the crime as a second degree murder, and by allowing the understanding regarding sentence term to stand unchallenged, the state and the superior court, agreed to give Mr. Pena the benefit of a release consistent with time that would be served by reference to the minimum term for that offense, and not just provide earlier consideration for parole. The intent of the parties involved the defendant, Mr. Pena, negotiating for early release in exchange for the prosecution obtaining the certainty of a conviction and avoiding a long and costly trial. Likewise, since the parties were contemplating a release consistent with the minimum term, they did not view the crime as an impediment to parole. In fact, by agreeing to the reduction in degree, the prosecution made it clear that it viewed this case as not deserving of the more extended punishment that would flow from obtaining a first degree murder conviction. The law is explicit that a defendant cannot be punished for charges or special allegations that are dismissed. (*People v. Harvey* (1979) 25 Cal.3d 754, 762.)

Like the situation in *Buckley, supra,* and *Brown v. Poole, supra,* at the time of plea and sentence, the court, defense counsel and the prosecutor led Mr. Pena to believe that he would be released at an early point in his incarceration, at his minimum term of

seventeen (17) years or less, based on earning the applicable credits. The "reciprocal benefit" contemplated by any plea contract, and certainly relied upon by Mr. Pena in choosing to plead guilty here, would be quite literally non-existent if the bargained for benefit was not considered to be some form of lessened punishment. (See *People v. Collins* [*Collins II*] (1996) 45 Cal.App.4th 849, 862, relying on *Brady v. United States* (1970) 397 U.S. 742, 752, 90 S.Ct 1463, 1471, 25 L.Ed. 747; *People v. Orin* (1975) 15 Cal. 3d 937, 942-943 [holding that the reciprocal benefit of a plea contract is lessened punishment]; see also *People v. Collins [Collins I]* (1978) 21 Cal. 3d 208, 214-215.) As these cases show, it is the release from prison at an earlier date that the defendant bargains for in entering a plea. That is precisely what Mr. Pena sought, and he has met his end of the bargain, foregoing each of his constitutional rights attendant to a trial, and faithfully serving his sentence over the last twenty two (22) years. Yet, the bargained for consideration, that of lessened punishment, will never be realized. The state, on the other hand, has already reaped every benefit of that same contract, having received the certainty of a conviction, saving the expense of trial, avoiding the inconvenience to the witnesses, and securing more than just a substantial punishment, but a punishment that is beyond every available matrix term for second degree murder, and which exceeds 38 of the 48 matrix terms for the greater offense of first degree murder. The result is grossly unfair, as the state obtained this conviction and Mr. Pena's waiver of his constitutional rights knowing that he directly understood that there would be a lessened punishment, and despite receiving what they wanted from the plea deal, Mr. Pena has been wholly denied any benefit whatsoever from that arrangement, and is now being subjected to a disproportionate punishment. Furthermore, he bargained for a requirement that he punished for a second degree murder, and a duty that the state not treat the offense as being of a greater degree, yet that is precisely what is occurring here. Even the Attorney General's response in the court below uses facts purporting to make the offense premeditated and deliberated, which the state in accepting the plea agreement directly bargained away.

The process of filing charges, and negotiating pleas growing out of those charges, is an executive function. (*Orin, supra,* at 942-943; see also *People v. Cimarusti* (1978)

11

81 Cal. App. 3d 314, 323.)    In the same fashion as the Governor was found to be in *Rosenkrantz V*,[6] the DA and Board are merely another arm of the same executive branch, bound by the same promises that were made on behalf of the state at the time of the plea and sentence.    This rule has been routinely followed. (See *U.S. v. Bakshinan* (1999) 65 F.Supp.2d 1104, 1106 ["A prosecutor who reaches a plea agreement with a defendant binds the government to that agreement."], and *Giglio v. U.S.* (1972) 405 U.S. 150, 154 ["The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes to the Government."].)    A plea agreement is a contract between the prosecutor representing the People, i.e. the Executive/the State, to which the court consents to be bound by its approval of the agreement. (See *Cunningham, supra,* 49 Cal.App.4th 1044, 1047; *People v. Cimmarusti* 81 Cal.App.4th 314, 323; *Giglio v. United States,* supra, at 154; *People v. Powers, supra,* at 915-917, *United States v. Anderson, supra,* at 606-608.)    Respondent did not cite any contrary authority in the court below.    Thus, the plea is binding on all the parties concerned in the parole hearing process, as the Board is simply another arm of the same state that entered into that contract.

Although this Court in *Rosenkrantz V* used the existence of facts showing that the offense had elements of a first degree murder, that type of analysis is specifically barred in a case where the conviction is based on a plea.    In the context of a plea, certain statutory provision set out what must occur and govern how the crime is ultimately to be treated.    For example, *Pen. Code* §1192 provides that "[u]pon a plea of guilty,…the court must before passing sentence determine the degree" of the offense in question.    Upon doing so, the law is very specific about the effect that the determination of degree has, stating that thereafter "…the defendant *cannot be punished for a higher degree* of the crime." (*Pen. Code* §1192.1, emphasis added.)    Once consummated, the duties of the parties are locked in.    *Penal Code* §1192.5 specifies that once "the plea is accepted by the prosecutor…and approved by the court…the court may not proceed as to the plea other than as specified in the plea."    Here, the degree of the crime was fixed at the plea, yet the

---

[6]    *In re Rosenkrantz [Rosenkrantz V]* (2002) 29 Cal. 4th 616, 660.

Board is treating the crime as though it was found to be of the first degree. In effect, the State induced a plea by agreeing to reduce the degree, yet is allowed to punish Mr. Pena as though he had been convicted of the bargained away greater degree. A rule permitting such a result would negate the very terms of a plea bargain, which unless otherwise stated, is based on the understanding that no adverse sentencing consequences will be suffered by reason of facts underlying and solely pertaining to a higher degree or a dismissed or uncharged count. (*People v. Harvey* (1979) 25 Cal.3d 754, 758.) Considering that the state specifically agreed to forego a finding that the crime was of the first degree, such actions are clearly a breach of the state's duties, and at least inherently unfair. These statutory rules show that the law directly prohibits the manner in which the Board is proceeding.

The standard that this Court applied in the jury trial context, that to find an offense particularly egregious the Board must demonstrate that facts pertaining to a crime, but for a jury's reasonable doubt, support conviction for a higher degree of the offense, cannot apply here. (*Rosenkrantz V, supra* 29 Cal.4th 616, 678-679; *Dannenberg, supra*.) Since that standard violates the premises on which plea agreements rest, its use in this case is both the statutorily and contractually precluded. (*Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155.) Petitioner's commitment offense therefore can neither be particularly egregious nor support a parole denial decision.

Again, these issues are not governed by the "some evidence" rule of *Dannenberg*. These facts were established by the Petitioner's supporting documentation, and are wholly uncontradicted by any evidentiary submissions from the Board. Thus, it is clear that the parties intended to treat the crime as not being an impediment to parole, and that the plea was accepted knowing the defendant understood he would be entitled to early release when he completed serving two thirds of the minimum term for his offense. As in *Buckely, supra*, and *Brown v. Poole, supra*, the result is that once that term has passed, as it clearly has here, the Board loses jurisdiction to do anything regarding Mr. Pena's parole, and certainly cannot treat the crime in a way that precludes parole.

13

### III.   WHERE A PRIMA FACIE SHOWING IS MADE IN THE ALTERNATIVE OF AN INVOLUNTARY PLEA, OR BREACH OF A PLEA AGREEMENT, AN EVIDENTIARY HEARING IS REQUIRED TO RESOLVE THE FACTUAL DISPUTES.

The proffered facts show a clear understanding by Mr. Pena that, although his sentence was to be *stated* to be 17 years to life, that sentence was to be discharged in a very specific way, pursuant to the agreement of the prosecutor and court. In other words, because of the representations made by the court and counsel during the plea colloquy, acquiesced in by the prosecutor, Mr. Pena was induced to plead guilty by the express representation that his "actual time" served would be less than seventeen (17) years. Thus, by simply programming in a generally acceptable fashion, Mr. Pena would earn his credits and be paroled at under his twelve (12) years, his adjusted minimum eligible date.

This understanding by Mr. Pena represents one of two possibilities:

1)  That the actual terms of the plea contract require release at the expiration of his minimum term of between twelve (12) and seventeen (17) years, so long as Mr. Pena earned his credits; *or*

2)  That the Court breached the plea agreement by sentencing Mr. Pena to a term that did not comply with the understanding of the parties and which could not result in the sentence believed by both the prosecution and defense would actually be received before released on parole.

In essence, if it is the former, since he exceeds that term, he is entitled to release. However, if the latter applies, Mr. Pena was not properly advised as to the nature of his potential sentence in light of the terms that were clearly understood as a result of the representations made on the record. (See *Santobello* v. *New York* (1971) 404 U.S. 257, 262; *Williams* v. *Taylor* (2000) 529 U.S. 420, 431-433, 437-438 [where the defendant is mislead as to the consequences of his plea it renders the plea involuntary].) Because he has already served well over the contemplated term in reliance on that understanding, the remedy again must be release.

Clearly established United States Supreme Court law directs that, for constitutional purposes, the interpretation and construction of a plea agreement is made under existing state law. (*Ricketts* v. *Adamson* (1987) 483 U.S. 1, 5, ftnt. 3; *Buckley, supra.*) This means that the plea bargain in this case must be viewed under the rules applicable to ordinary contracts. Of course, the framework within which that interpretation is conducted is the overriding requirement that every inmate convicted by virtue of a plea agreement must receive their "reciprocal benefit" or "mutuality of advantage" that in this case is only realized when Mr. Pena is actually released on parole. (*Brady v. United States* (1970) 397 US 742, 752.) Here, the District Attorney negotiated with Mr. Pena's attorney to convict him of a second degree murder, and in inducing him to enter that plea, allowed to stand unchallenged representations that he would serve between 12 and 17 years, depending on his applicable earned credits. Mr. Pena relied on these representations in deciding to accept the plea.

To the extent that this language creates an ambiguity in terms of how long Mr. Pena should serve in prison, then standard contractual interpretation law requires that the next step in determining the meaning of the contract is to go to *Civil Code* § 1649. (*Bank of West* v. *Superior Court* (1992) 2 Cal. 4th 1254; *Buckley, supra.*) That provision states that in the event of ambiguity or uncertainty, the contract "must be interpreted in the sense in which the promissor [here the court] believed at the time of making it, that the promisee [here Mr. Pena] understood it." The court, as well as the District Attorney, could not reasonably have understood that Mr. Pena believed that there was anything standing between him and early release other than the issue of earning his credits. Likewise, the third level of analysis under *Bank of the West, supra*, and *Buckley, supra,* is to apply the provisions of *Civil Code* §1654, which also results in a determination in favor of Mr. Pena. That section provides that the "language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Clearly, here, that was the court who made the statement confirming that the term was 17 years less credits that Mr. Pena relied on in deciding to plead guilty, and the prosecutor who

15

allowed that statement to go unchallenged.  (See also *People* v. *Toscano* (2004) 124 Cal. App. 4th 340 ["ambiguities are construed in favor of the Defendant"].)

Thus, in order to accurately assess the plea issue in this case, it was necessary in the Courts below that a full evidentiary hearing be held at which these facts could be developed, and oral argument presented, to show that there was a clear understanding on the part of Mr. Pena that he had a right to early release, at least by 17 years, and earlier if he earned his credits. This belief was objectively reasonable on his part in light of the colloquy that occurred during the plea negotiations

In summary, an evidentiary hearing was necessary in order to fully develop the facts regarding the allege breach of the plea agreement. Mr. Pena gets no benefit of his plea and fails to receive the well established "leniency in return for a plea that is denied if one goes to trial [as] the standard of punishment is necessarily different for those who plead and those who go to trial." (*Corbitt v. New Jersey* (1978) 439 U.S. 212, ftnt. 14, at 223-224.) Rather than receive that benefit, what the Superior Court has done by denying the writ is to "let the Defendant plead to certain charges and then be penalized on charges that have been dismissed [which] is not only unfair, it violates the spirit, if not the letter, of the bargain." (*United States v. Castro-Cervantes* (9th Cir. 1990) 927 F.2d 1079, 1082.) This occurs when the Board, as it has done at each hearing, characterizes the offense as calculated or premeditated. As such, an evidentiary hearing is needed in order to clearly establish the agreed to plea.

IV.  *THE BOARD OF PRISON TERMS DEPRIVED MR. PENA OF HIS FEDERALLY PROTECTED LIBERTY INTEREST AND VIOLATED HIS 5th AND 1 4th AMENDMENT RIGHT TO DUE PROCESS BY MAKING FINDINGS AND DECISIONS UNSUPPORTED BY SOME RELEVANT, RELIABLE EVIDENCE.*

Parole can be denied an indeterminately sentenced prisoner only when sufficient, reliable evidence establishes that one or more of the Board's regulatory provisions, *Cal. Code Regs.*, tit. 15, §2402(c) shows unsuitability. The use of non-regulatory factors, or

16

their unsupported use, to deny parole would violate the inmate's rights under the Due Process Clause of the Federal Constitution, as is occurring in this case.

### A. THE BOARD'S CONCLUSION THAT MR. PENA POSES AN UNREASONABLE RISK OF DANGER TO THE PUBLIC DUE TO THE NATURE OF HIS COMMITMENT OFFENSE IS NOT SUPPORTED BY SOME RELIABLE EVIDENCE.

In order for a commitment offense to be "particularly egregious" and support parole denial, some relevant evidence must reliably show one or more of the factors listed in *Cal. Code Regs.*, Title 15, section 2402(c)(1)(A)-(E) define its circumstances and show that Mr. Pena currently presents an unreasonable risk of harm if paroled. (*Scott II, supra,* 133 Cal.App.4[th] at 594-595.) Here, the Board attempted to support their conclusion by declaring that his crime was "carried out in an especially cruel and callous manner...[and]in an dispassionate and calculated manner...[and] in a manner that demonstrates an exceptionally callous disregard for human suffering." (Exh. F, p. 37.) The first finding, "an especially cruel and callous manner," appears to be duplicative of the third finding, as it does not even utilize the actual regulatory language ["*exceptionally callous* disregard for the life or suffering of another"]. (*Cal. Code Regs.*, tit. 15, §2403(c)(1)(D), emphasis added.) The second finding, that of a "dispassionate and calculated manner," also does not utilize the actual regulatory language, as the full standard states "[t]he offense was carried out in a dispassionate and calculated manner, *such as an execution style murder." (Cal Code Regs,* tit. 15 § 2402 (c)(1)(B)." No other crime based finding was made. However, the law requires a two part determination to support a denial of parole. First, the evidence must establish facts meeting the actual criteria set forth in the regulatory factor governing the finding at issue. Secondly, there must be a nexus between the finding, under the facts of the case, and the ultimate standard of parole suitability under *Cal Code Regs.*, tit. 15, §2402(a), *i.e.,* that the inmate presents an unreasonable risk of danger to society if paroled. (*Scott II, supra,* 133 Cal.App.4[th] at 594-595.) It is on these two points that the evidence fails in this case.

17

On the first issue, the need to rely on actual regulatory factors, this Court stated in *Rosenkrantz V, supra*, at 654,

> "Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole *in light of circumstances specified by statute and by regulation.*" (Emphasis added.)

The Supreme Court reiterated this point, noting that the decision to deny parole must be "...*based upon the factors specified by statute and regulation...[and] consideration of the specified factors.* (*Rosenkrantz V, supra*, at 658, emphasis added; see also *In re Mark Smith* (2003) 109 Cal.App.4th 489, at 504-505 ["there is nothing in the governing statutes or regulations to support the Governor's reliance on *Smith's* non-violent criminal record."].) Thus, the case law is clear that findings must fit within the regulatory criteria of unsuitability under *Cal. Code Regs.*, tit. 15, §2402(c). No decision has stated the contrary rule, and thus, there is no authority for the proposition that the Board is allowed to rely on factors outside the provisions of *Pen. Code* §3041 or the regulations. If the various panels of the Board were allowed to simply make up new criteria as each panel saw fit, applying them to whichever inmates they choose, the entire regulatory scheme would be rendered unconstitutionally vague.[7] As such, the first inquiry is whether the evidence fits within an established unsuitability factor under the regulations.

Here, of the Board's three findings, only the third actually used the proper regulatory criteria. The first appears to simply be a different way of stating the third, and therefore, will be addressed with the third finding. The second deserves special mention. The fact that the crime is "calculated or dispassionate" is only relevant when the circumstances showing it to be "an execution style murder." (*Cal. Code Regs*, tit. 15,

---

[7]    "A statute must be definite enough to provide a standard of conduct for those who are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it." (*People v. McCaughan* (1957) 49 Cal.2d 409, relying on *Lanzetta v. New Jersey* (1939) 306 U.S. 451, 453, [83 L.Bd 888, 890, 59 S.Ct 618], holding, "No one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the state commands or forbids.")

§2402 (c)(1)(b).) Such terminology has no application to a case such as this. Instead, it is deigned for a murder that occurs in a distinct factual pattern, one showing a particular dangerousness in the part of the defendant who commits an act of executing the victim. Because the prisons have to implement Board regulations that use this identical terminology in their housing of inmates who have committed murders (see *Cal. Code Regs*, tit. 15, §3375.2 (a)(7)(A)), the term "execution style murder" has a particularized meaning in prison jargin, and a CDC Memorandum was actually issued to define it as "those crimes wherein the victim was shot in the head after being bound or cuffed, made to kneel , made to lie down, or made to face a wall." (See Exh. 1 to the informal reply in the Court of Appeal.) No such actions occurred factually in this case. Accordingly that finding was wholly unsupported by the evidence.

As to the first and third finding "an exceptionally callous disregard for human suffering," there likewise was no evidence. The actions of Mr. Pena during the commission of the crime simply cannot support such a finding, particularly as compared with decisions such as the *Ernest Smith* case. Mr. Pena was young, intoxicated, and acting under the belief that he was dealing with an individual that was armed, supported by other friends, and had previously demonstrated his violent potential by shooting and killing Mr. Pena's uncle. Thus, while serious, the conduct that is fairly attributable to Mr. Pena certainly did not show an "exceptionally callous" disregard for suffering. While he shot the victim, he did nothing to prolong the victim's suffering. (See *Ernest Smith, supra,* 114 Cal.App.4th 343 [shooting the victim three times in the head does not demonstrate exceptionally callous disregard for human suffering, absent deliberately extending a victims suffering, torture, or the like].) To the contrary, the actions of Mr. Pena were simply directed towards killing the victim, not causing any untoward suffering, torture, tormenting, or other form of action that would prolong the victims pain. In other words, like any murder, the actions were meant to kill, but not in a way that sets it out as an exceptionally callous means of doing so.

When allowed to be used in this fashion, these criteria are overly vague, leaving inmates unable to determine if the criteria should properly apply to their particular

offense. However, the standard enunciated in *Dannenberg* compounds the vagueness issue, as it authorizes the denial of parole to be based solely on the crime so long as it has facts which are "more than minimally necessary to convict" the inmate of the offense in question. The Board is applying that standard irrespective of whether the offense meets the regulatory criteria for particularly egregious murders under 2402(c)(1). A statute (or regulation) is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989). In addressing a vagueness challenge, the first question is "whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in a particular case." *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346 (9th Cir. 1984). If allowed to be used as the Board did in this case, the factors set forth in *Cal. Code Regs.*, tit. 15, § 2402(c) used by the Board to determine whether the crime was committed in an especially heinous, atrocious or cruel manner, as applied, are purely subjective, and are unconstitutionally vague. As such, these factors are not easily understood or explained, thus, Mr. Pena did not have notice that they would apply to his case.[8]

Accordingly, there is nothing about the crime facts that reliably establish that Mr. Pena remains dangerous twenty-two (22) years later.

### B.    MR. PENA'S PAROLE DENIAL IS NOT SUPPORTED BY ANY NON-OFFENSE FACTOR.

None of the other factors of unsuitability apply either, and there is no evidence of them in the record. *Cal. Code Regs.*, tit. 15, section 2402 sets forth the criteria the Board is to use for determining if an inmate is unsuitable or suitable for parole. A Board panel can find a prisoner unsuitable for parole if evidence shows one or more of the non-offense circumstances contained in subsections 2402(c)(2) through (6) define a prisoner's

---

[8] This Court has determined that, in cases involving the death penalty or life without the possibility of parole, the terms "especially heinous, atrocious, or cruel, manifesting exceptional depravity" are unconstitutionally vague and violative of fundamental due process. *Superior Court of Santa Clara v. Engert* (1982) 31 Cal.3d 797, 805.

conduct before or following the offense. Section 2402(d) identifies criteria which if applicable tend to indicate a prisoner is suitable for parole:

> "(2)    Previous record of violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age (3) Unstable social history. The prisoner has a history of unstable or tumultuous relationships with others (4) sadistic sexual offenses...(5) Psychological factors.    The prisoner has a lengthy history of severe mental problems related to the offense. (6) Institutional behavior.    The prisoner has engaged in serious misconduct in prison or jail."

The evidence clearly demonstrates that all of these factors are unequivocally in favor of Mr. Pena.  He has no previous record of violence (*Cal. Code Regs.,* tit. 15, §2402(c)(2).) As is discussed in the previous section, the case law is clear that the evidence must meet a regulatory criteria, and the relevant section (§2402(c)(2)) requires that the priors be violent.  Thus, the Board's finding of "a history of minor criminality as mentioned earlier, coming to the United States illegally as well as reckless driving and providing false information to a peace officer" (Exh. F, p. 41), cannot establish unsuitability. (*Mark Smith, supra,* 109 Cal.App.4[th] at 504-505 ["there is nothing in the governing statutes or regulations to support the Governor's reliance on *Smith's* non-violent criminal record."]    Mr. Pena does not have an unstable social history, as there was no proof of "unstable or tumultuous relationships with others."[9] (*Cal. Code Regs.,* tit. 15, §2402(c)(3).)  This is particularly true during his time in prison, as he has continued to maintain healthy relationships throughout his twenty-two (22) years of incarceration. (See *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, at 915 [a "history" requires proof of continuing conduct, including during the inmate's time in custody].)    He has not

---

[9]    The Board's finding of a "history of unstable, tumultuous relationships with others" is simply based on the fact that he began to drink at the age of 9.  However, there is no proof of any impact on Mr. Pena's relationships as a result of his drinking, and in any event, no "pattern" develops when he has spent 22 years in prison without any such problems.  Nor can the findings of "prior criminality" be relied upon, since it is not violent.  Even aside from the lack of applicability to the regulatory criteria, the prior alcohol usage issue cannot be relied on either, as Mr. Pena has entered into recovery.  (See *Thompson v. Davis* (9th Cir. 2002) 282 F.2d 780.)

committed sadistic sexual offenses (*Cal. Code Regs.*, tit. 15, §2402(c)(4)), and had a positive psychological evaluation. (*Cal. Code Regs.*, tit. 15, §2402(c)(5)). Furthermore, as is discussed in the following section, his disciplinary history does not support a denial of parole. (*Cal. Code Regs.*, tit. 15, §2402(c)(6)).

Thus none of the non-offense criteria indicate Mr. Pena is unsuitable for parole.

### C.   THE BOARD IS USING THE WRONG STANDARD TO EVALUATE CDC 115 VIOLATIONS FOR PAROLE SUITABILITY.

At the hearing, the Board relied on Mr. Pena's single non-violent CDC 115 received in 2001. Here, the Board is using the wrong standard for evaluating CDC 115 violations as a basis for parole denial on several levels. First, the referenced disciplinary does not qualify as a "serious discipline" under any standard. (*See In re Mark Smith, supra*, 109 Cal.App. 4th at 505.) Here, the 115 at issue was simply for refusing to report to work. Thus, this write up simply does not qualify under the regulatory standard as "serious misconduct" in prison, sufficient to justify refusing to grant parole. (*Cal. Code Regs.*, tit. 15, §2402(c)(6).) Furthermore, even if it technically constituted an act of "serious misconduct," there is no rational connection between this incident of not reporting for work and the sole issue in a parole hearing, whether Mr. Pena currently presents an unreasonable risk of violence if paroled. Certainly, failing to show up for work, is not an indication of someone who presents an unreasonable risk of violence if paroled. The work related write up barely deserves mention, as it cannot possibly have any tendency in reason to establish future dangerousness.

However, that issue need not even be reach, as this type of write up was never meant to be a bar to a finding of unsuitability. This is because the 115 is not sufficient to justify rescinding a parole date, and under a proper interpretation of the regulatory standards, it cannot be relied on to refuse a parole date in the first place. The Board's own regulatory criteria differentiate two types of "serious" disciplines. The first is in *Cal. Code Regs.*, tit. 15, §2410. Section 2410 deals with violations that would warrant reduction of post commitment credits, which presumes that the inmate has been granted a parole date despite

the rule infraction. Thus, the standards are low. (See *Cal. Code. Regs.*, tit. 15, §2410.)  A determination of parole suitability cannot rely upon the same standards. Instead, the proper standards to use for denying parole, as opposed to merely withholding credits, are those which are set forth in §2451, dealing with the Board's power to rescind a parole date that has been granted. This standard is much greater than under §2410, and is in better proportion to the severe penalty that follows, *i.e.,* the refusal to release the inmate. In sum, the Board's own rules show that the withholding of a parole date requires a more stringent showing than is required to withhold post commitment credits. Clearly, the same standard cannot be used for the denial of parole.

Therefore, under the proper standard, Mr. Pena's 115 does not warrant parole denial as the discipline relied on by the Board does not qualify under §2451, and his disciplinary pattern in recent years remains acceptable for parole suitability purposes. (*See In re Mark Smith, supra*, 109 Cal.App. 4th at 505.) As such, Mr. Pena has demonstrated suitability through his in prison behavior. He has continued to take self help courses that teach him how to more appropriately handle pressure and stress, and was even commended for his continued participation in AA and the Inmate Peer Education Program, and he has additionally fully committed himself to substance abuse programs. Thus, neither his disciplinary history nor self-help programming are factors of unsuitability.

    *V.    THE UNITED STATES SUPREME COURT DECISIONS OF APPRENDI AND BLAKELY PROHIBIT ANY SENTENCING AUTHORITY FROM IMPOSING GREATER PUNISHMENT THAN THAT AUTHORIZED BY THE FACTUAL FINDINGS MADE BY THE TRIER OF FACT.*

The Board determined that Mr. Pena's crime was "carried out in an especially cruel and callous manner...[and]in an dispassionate and calculated manner...[and] in a manner that demonstrates an exceptionally callous disregard for human suffering." (Exh. F, p. 37.) However, as discussed more fully herein, these findings constitute enhancements, additional charges and finding that are legally inadequate to support the Board's ruling both based on California's own regulatory parole system and when applying clearly established United States Supreme Court authority.

23

In two recent United States Supreme Court decisions, our High Court has stated that the constitutional right to due process, and the right to a jury trial, requires that each and every fact used to increase the penalty for a crime *must be alleged and found true by the trier of fact*, be it by jury or a defendant's own admission of facts in a plea of guilty. (*Apprendi v. New Jersey* (2000) 530 U.S. 466; *Blakely v. Washington, supra*, 542 U.S.) These principles bar the Board from making findings that take the inmate's case outside the normal sentencing scheme, the matrix, as the Board's "findings" that support the denial of parole suitability act as both a literal and effective change in the crime originally charged or convicted. Such a change is a constructive amendment and is prejudicial per se. (*Jones v. Smith* (9th Cir. 2001) 231 F.3d 1227, 1232-33.)[10] As stated by the U.S. Supreme Court:

> "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi v. New Jersey, supra*, at 490.)

Originally, some courts and prosecutors believed that this simply meant that the sentence could not exceed the maximum possible penalty available under the statute violated, rather than to a sentence that merely exceeds the presumptive or normal sentencing range. This point of confusion was cleared up by the decision in *Blakely v. Washington, supra*, the Supreme Court made even clearer what it meant by a "statutory maximum term" as referenced in *Apprendi*. "When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' [citation], and the judge exceeds his proper authority.' [Citation.]" (*Blakely v. Washington, supra*, 542 U.S. 296.)

The Board's responsibility in setting terms is tightly regulated, structured in the same fashion as the duties of a trial judge in pronouncing sentence. (See *e.g.*, *Pen. Code* §3041.5 [written statement of reasons]; *Cal. Code Regs.*, tit. 15, §§2282(a) & 2403(a) [must utilize matrix]; *Pen. Code* §3041(a) [must follow sentencing rules]; *Cal. Code*

---

[10] See *Stirone v. United States* (1960) 361 U.S. 212, 218 [where a defendant is convicted of a crime and where the grand jury never charges the defendant with an essential element of the crime, a constructive amendment has occurred and reversal is warranted].

*Regs.*, tit. 15, §§2282(a) & 2403(a) [required to set middle term].)   Here, the process of indeterminate sentencing occurs in a fractured proceeding, starting in the trial court, where a plea agreement is entered into on behalf of the state of California by the District Attorney's office, a representative of the executive branch of the state. Then, the initial aspect of the sentencing function is discharged by the judicial branch of government, and an outside range is set by the court, which simply establishes the minimum and maximum parameters of the sentence.   Finally, the case is returned to the executive branch of the state, to the Board of Parole Hearings, to determine suitability and set a term within that sentencing range.   The sentencing process is not complete until the term is set and the inmate released. (See *In re Roberts* (2005) 36 Cal. 4th 575, at 589-590 [treating parole as an integral part of the overall process of sentencing]; see also *In re Sena* (2003) 94 Cal.App.4th 836, at 839.) As such, the Board is an entity that wears two (2) hats, serving as part of the executive branch, but discharging certain judicial functions as an extension of the sentencing process.   As such, the Board is the functional equivalent of a judge for *Apprendi-Blakely* purposes.

In *Rosenkrantz V*, this Court made it clear that the public safety exception in *Pen. Code* §3041(b) is just that, an exception.   The *Dannenberg* decision likewise acknowledged this point. (*Dannenberg, supra*, 34 Cal.4th at 1080.) Absent findings that fit the crime within that exception, the Board is required to follow the "shall normally" formulation and find the inmate suitable. Once that occurs, the *Dannenberg* noted that the use of the matrix is mandatory. (*Id*. at 1078.) Thus, the matrix constitutes the "normal" or "standard" sentencing range for *Apprendi-Blakely* purposes.   It is only by making the regulatory findings under *Cal. Code Regs.*, tit. 15, §2402(c)(1) that the Board is permitted to go outside the matrix based on the crime.   Thus, those findings are subject to the rules announced by the Supreme Court in *Apprendi* and *Blakely*.

In short, since the Board is serving a sentencing function, and the matrix terms constitute the presumptive or "normal" sentencing range for *Apprendi-Blakely* purposes, these rules bar the Board from making findings to take the case outside that range. A contrary rule would violate the due process protections enunciated in *Apprendi* and

*Blakely*.  Such violations occur any time the Board makes rulings about the crime being "exceptionally callous," or "especially heinous, atrocious and cruel," or "dispassionate and calculated," or as having a "trivial or insignificant" motive, since the facts underlying those claimed circumstances were not tried to the jury at the time of the conviction or admitted by the defendant.[11]

Because this violation by the Board involves  the interpretation of statutory law, a non-deferential *de novo* review standard applies and the "some evidence" standard does not apply.  (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800 [questions of law are reviewed *de novo*]; *Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155.)

### VI.   THE BOARD'S REPEATED RELIANCE ON THE COMMITMENT OFFENSE VIOLATES DUE PROCESS.

Here, throughout the courts below, respondent failed to address the issue of repeated denials of parole based on the commitment offense, and wholly ignored the recent decision in the case of *In re Scott [Scott II]* (2005) 133 Cal.App.4th 573, at 594-595 [use of crime to deny parole is only valid if it reliably shows current dangerousness; probative value declines the longer it has been since the offense, and thus, offense based denials must be closely evaluated by the courts].  What the Board is doing is failing to address the appropriate legal concepts governing parole decisions under both the California and United States Constitutions.  As the authorities make clear, the mere assertion that a finding is supported by "some evidence" is not necessarily sufficient, and does not end the inquiry.  As the *Ramirez*[12] court concluded,

---

[11] Petitioner is aware of this Court's decision in *People v. Black*, 35 Cal.4th 1238 (2005). However, the issues presented in that case are markedly different than the ones presented herein. In *Black*, the petitioner argued that a defendant is constitutionally entitled to a jury trial on the aggravating factors that justify an upper term sentence or a consecutive sentence.  Here, Petitioner is not contending that the *Apprendi-Blakely* rule applies to which of the 3 terms to select, or even which of the various triads of terms within the matrix applies to the case. Instead, it is Petitioner's contention that the Board cannot make findings regarding the crime to altogether take it out of the prescribed matrix which applies based on the facts already determined by either a jury or a plea agreement.

[12] *In re Ramirez* (2001) 94 Cal.App.4th 549. This Court in *Dannenberg, supra,* 34 Cal.4th 1061, at 1100, disapproved only of that portion of the *Ramirez* decision that requires consideration of

"The United States Supreme Court had made it clear the 'some evidence' standard discussed in *Hill, supra*, 472 U.S. 445, is ***only one aspect of judicial review for compliance*** with minimum standards of due process. [Citation] ...   The court explained that the 'some evidence' standard applied only to questions of evidentiary sufficiency. It is ***an additional requirement of due process, not a substitute for other established due process requirements***. [Citation.]" (*Ramirez*, at p. 563-564.)

"Accordingly, were the Board to determine whether inmates are suitable for parole by flipping a coin, it could not insulate its proceedings from judicial correction simply by identifying 'some evidence' in the record to support each result." (*Id*, at p. 564, emphasis added.)

The *Ramirez* court concluded that the Board's decision "...was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it" and that the lack of support for the findings "supports Ramirez's claim that his parole hearing was a sham." (*Id.*, at 571.)  *Penal Code* §3041 requires that the factors relied upon, and supported by some evidence, must be factors that indicate a legitimate concern that the prisoner currently poses a threat to public safety if released. (See *In re Ernest Smith* (2004) 114 Cal.App.4th 343, at 370; see also *In re Scott [Scott I]* (2004) 119 Cal.App.4th 871, at 890-892; *Scott II, supra*, 133 Cal.App.4th at 594-595.) The *Ramirez* Court acknowledged that there will always be "some evidence" to support a finding that a prisoner committed the underlying offense.    Those facts alone, however, do not invariably justify the denial of parole. Thus, while finding that there was factual support for the findings as to the crime and priors, the *Ramirez* Court still found the Board's

---

the matrix, and proportionality analysis of the crime in comparison with other similar offenses. This issue, along with the balance of the *Ramirez* decision was not overruled. Furthermore, it is Petitioner's contention that *Ramirez* was correct, and that under a federal due process analysis, a comparative, proportionally analysis is required.    Certainly, even if proportionality and the matrix are not considered, in ascertaining whether the crime is particularly egregious, and thus, can justify a continued refusal to grant parole, at least a general comparison of similarly categorized offenses must be conducted under the express terms of the regulations. (See *Cal. Code Regs.*, tit. 15, §2402(c)(1) ["...*especially* heinous, atrocious and cruel"], (c)(1)(D) ["...*exceptionally* callous disregard..."], §2402(c)(1)(E) ["...*trivial or insignificant* motive..."], etc. Emphasis added.) Obviously, resolution of whether an offense fits these standards requires that it be viewed in the context of the level of violence and dangerousness it shows in relation to other crimes of the same class.

27



decision arbitrary since there had been multiple hearings, nine (9) years had passed beyond the minimum term, and it was 17 years after entering prison. (*Id.*, at 571.) Likewise, as the 9th Circuit recently said, despite the fact that there may remain evidence to support a finding of egregiousness of the crime:

> "A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, at 916-917.)

In *Scott II*, 133 Cal.App.4[th] at 594-595, the court noted that a finding of unsuitability *can* be based on the commitment offense alone, but qualified that point by noting the following:

> "The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his "Previous Record Of Violence"). Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair (citation omitted), and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (citation omitted). The commitment offense can negate suitability only if circumstances of the crime *reliably established by evidence* in the record *rationally indicate* that the offender *will present an unreasonable pubic safety risk* if released from prison. Yet the *predictive value of the commitment offense may be very questionable after a long period of time*. (citation omitted) Thus, *denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny*." (Emphasis added.)

(See also *Irons v. Warden* (E. D. Cal. 2005) 358 F.Supp.2d 936, 947, fn. 2.) In applying these rules, even if the crime may be considered egregious, it is obvious that only the first denial may be based exclusively on the immutable facts of the crime to be consistent with federal due process principles, and *any subsequent denial* requires the existence of facts showing that the inmate *currently* presents an unreasonable risk of danger if paroled. It is beyond logical dispute that this is the correct rule. To rule otherwise puts the inmate in an impossible situation, where no matter what he shows in terms of positive behaviors, self help, work skills, parole plans, or just rehabilitation in

28

general, he would never be able to overcome the facts of the crime, since they will never change. Here, the Board has repeatedly used the facts of the crime as the real reason[13] for denying parole, yet, they have never tied those facts to current behaviors showing that Mr. Pena *still presents an unreasonable risk at this time.*

This recognizes what the Ninth Circuit in *Biggs* alluded to when it talked of the rehabilitative goals of the system, and the need to take into consideration that a person can change. Likewise, in the recently published decision of *Irons v. Warden, supra*, 358 F.Supp.2d 936, the court pointed out the continued use of immutable factors to deny parole (e.g. the commitment offense itself and pre-incarceration factors), without real evidence of current dangerousness, violates due process. *Irons* occurred in a factual context that was far more egregious than that of Petitioner, that would show much more dangerousness on the part of inmate Irons than here. Like Mr. Pena, *Irons* was in the context of a fourth hearing, yet, the court still found that this fourth denial of parole to Irons violated the rule of *Biggs*. Certainly, after twenty-two (22) years of incarceration, four (4) hearings, and more than ten (10) years after completing his minimum term, this case presents a far clearer example of a due process violation, and compels a grant of relief.

### VII. THIS COURT'S INTERPRETATION OF THE ACTIONS BY THE LEGISLATURE AS DESCRIBED IN DANNENBERG RESULTS IN AN UNCONSTITUTIONAL RETROACTIVE LEGISLATION, WHICH DIRECTLY IMPAIRS THE CONTRACTUAL AGREEMENT BETWEEN THE STATE AND MR. PENA.

This Court recently found in the case of *In re Dannenberg* that, by virtue of not correcting the Board's actions with reference to its application of *Pen. Code* § 3041, the Legislature, "presumably aware of the established administrative construction, has implied its acquiescence therein by amending the governing statute in ways that do not disturb the agency's policy." (*In re Dannenberg, supra*, 34 Cal.4th at 1082.) Such a

---

[13] Although the Board also claims other non-crime bases for their decision, as is discussed herein, those "reasons" have absolutely no factual basis, and are made in the face of directly contrary evidence.

finding means that the Legislature has effectively altered §3041, giving a new meaning to the phrase that the Board "shall normally" set a parole date. However, litigants have relied on that phrase since the statutory language was added in the late 70's, and relied on parole being the rule in deciding to enter into plea bargains. Such reliance is patently reasonable, as it has long been the rule that the term "shall" is always treated as imposing a mandatory duty or direction. (*Esco v. Zerbst* (1935) 295 U.S. 490, 493; *Anderson v. Yungkau* (1947) 329 U.S. 482, 485; *Webber v. Crabtree* (1998) 158 F.3d 460; *Newman v. Chater* (1996) 87 F.3d 358, 361; see also *McQuillion v. Duncan [McQuillion I]* (9th Cir. 2002) 306 F.3d 895, at 901-902 [mandatory language of §3041 creates a presumption of parole suitability].) By allowing the Board to amend the statute, the Legislature thereby is effecting an unconstitutional impairment of the State's obligation under the existing plea contract entered into with Mr. Pena, and other similarly situated inmates, in violation of the United States Constitution, Article I, § 10. (U.S. Const. Art. I, §10.) As applied to Mr. Pena's case, any reading of *Penal Code* § 3041 which alters the interpretation that the Board "shall normally set a release date," or which eliminates the mandate requiring the normal use of the matrix, is an improper interference with the contract entered into between Mr. Pena and the State, as he relied on that plain wording in deciding to settle his case.

The provisions of section 10, article 1 of the federal Constitution protects the obligation of contracts against state action. More particularly, it prohibits the state legislature from enacting any law that retroactively impairs contract rights. The state action which impairs any contract in which the state or political subdivision is a party will be evaluated using strict scrutiny, especially if the action reduces the obligation[14] of the state under that contract. The action must be in furtherance of a compelling state interest, and must be narrowly tailored to promote that interest. (See generally *Home Guilding & Loan Association v. Blaisdell*, (1934) 290 U.S. 398). In evaluating the

---

[14] There is no substantial impairment if the state has reserved the power to revoke, alter, or amend the contract. (*Dartmouth College v. Woodward*, (1819) 17 U.S. 518.) However, it must be noted that Mr. Pena has fully performed the contract, thereby making it irrevocable.

interference, a three part test is applied: 1) Does the legislation substantially impair a party's rights under an existing contract. 2) If so, is the legislation necessary for a compelling governmental interest and 3) Is it reasonable and narrowly tailored to promote that interest. (*Id.*)

Although the United States Supreme Court has found that while there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence" (*Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, (1979) 442 U.S. 1,7), it has also determined that a state's statutory parole scheme, if it uses mandatory language, may create a presumption that parole release will be granted upon certain conditions, thereby give rise to a constitutionally protected liberty interest. (*Board of Pardons v. Allen*, (1987) 482 U.S. 369, 376-78 [Montana parole statute providing that the Board "shall" release prisoners, subject to certain restrictions, creates due process liberty interest in release on parole]; *Greenholtz, supra*, 442 U.S. at 11-12 [Nebraska parole statute providing that the Board "shall" release prisoners, subject to certain restrictions, creates due process liberty interests in release on parole.]) Thus, a prisoner gains a legitimate expectation in parole that cannot be denied without adequate procedural due process when certain language is used. (*Allen, supra*, 482 U.S. at 373-81; *Greenholtz, supra*, 442 U.S. at 11-12; see also *McQuillion I, supra*, and *Biggs, supra*.)

Here, California's parole scheme, namely *Penal Code* § 3041, uses such mandatory language and gives rise to both the expectation of parole and protected liberty interests. (*McQuillion I, supra*, and *Biggs, supra*.) *Penal Code* § 3041 states in pertinent part that the Board "shall" set a release date. Accordingly, under the clearly established framework set forth in *Allen* and *Greenholtz*, for purposes of federal due process, "California's parole scheme gives rise to a cognizable liberty interest in release on parole." (*McQuillion I, supra*, 306 F.3d at 902.) This understanding has been relied upon by defendants, prosecutors and judges when negotiating settlements and entering into plea agreements. It has been a fundamental understanding that save for violent post-conviction misconduct by the prisoner, the terms of the applicable matrix will be abided

31

by and the prisoner "shall" be granted parole accordingly. For the Legislature to alter the plain meaning of the statute after literally thousands of defendant's have entered into plea contracts based on this understanding of the plain language of the statute is a clear violation of the constitutional standards under Art. I, §10.

As applied here, Mr. Pena entered into a plea agreement for a single count of second degree murder, with the prosecutor stipulating to that degree of the charge, and the allegations of premeditation and deliberation were dismissed. The purpose was to obtain the benefit of a reduced overall amount of time served, and this fact was specifically discussed as being the inducement for the plea. In exchange, the prosecution received the certainty of a conviction, saved the expense of a costly trial, made the process far more convenient to its witnesses, saved valuable resources of the state's prosecuting agency, and exacted a significant punishment. As such, Mr. Pena relied upon the plain language of *Penal Code* § 3041 which mandates that the Board must set a fixed date for parole release, pursuant to the principle of "uniform terms" for crimes of similar gravity, and with due regard for the statutory minimum term for the inmates' offense, unless it finds the prisoner's crime "particularly egregious" in comparison to other offenses of the same class. (*Penal Code* §3041, *California Code of Regulations* Title 15 [*Cal. Code Regs.*, tit. 15] §§2400 et seq.; *Ramirez, supra*, 94 Cal.App.4th 549; *McQuillion I, supra*, 306 F.3d 895.)[15] Of course, the history of practices by the Board that this Court refers to in *Dannenberg* had not occurred when Mr. Pena entered into the plea contract, and that point was thus never considered by the parties. As such, Mr. Pena was sentenced to seventeen (17) years to life under the *express* understanding of the plain meaning of §3041 and the matrix was that he would serve the "statutory minimum" for the offense. As noted *supra*, this plea agreement is a contract. (*United States v. De La Fuente* (9th Cir. 1993) 8 F.3d 1333, 1337-1338; *United States v. Kellar* (9th Cir. 1990) 902

---

[15] It is recognized that this Court has ruled in *Dannenberg* that a comparative proportionality approach is not necessary. However, it is respectfully contended herein that such an approach is in fact required by federal due process principles, thereby necessitating this Court re-thinking the *Dannenberg* formulation.

F.2d 1391, 1393; *United States v. Anderson* (9ᵗʰ Cir. 1992) 970 F.2d 602, 606; *People v. Cunningham, supra*, 49 Cal. App. 4ᵗʰ 1044.)

Therefore, for the Legislature to alter the meaning of § 3041 over twenty two (22) years after the forming of the contract is a direct interference with the State's contractual obligations and an infringement of Mr. Pena's constitutional rights. (*In re Dannenberg, supra*, 34 Cal.4th at 1071, 1082; U.S. Const. Art. I, § 10.) This alteration in the meaning of § 3041 substantially interferes with Mr. Pena's contractual expectations as it allows the Board to disregard the agreed term of seventeen (17) years or less, and justifies transforming his parole eligible sentence into life without the possibility of parole as long as there is more evidence than is minimally necessary to convict. This strips him of his liberty interest in parole and removes any uniformity that all parties to the contract understood existed. Furthermore, under a strict scrutiny analysis, although public safety may be a compelling State interest, the means chosen are *clearly* not reasonable nor are they narrowly tailored. Mr. Pena is a perfect example of this unreasonable application. With good time credit, he has served nearly thirty one (31) years and has exceeded 38 of the 48 first degree murder matrix terms. This is without *any* valid basis for parole denial, and in the face of clear evidence of actual rehabilitation.

This Court recently held in the case of *Dannenberg* that *Penal Code* § 3041 does not require a proportionality evaluation to be done by the Board before granting parole, that no uniformity in sentencing need be considered, and the Board has wide discretion in determining suitability. (*In re Dannenberg, supra*, 34 Cal.4th at 1070-71.) The Court supported its decision by stating that "the Legislature has not disturbed the Board's longstanding formal policy that a determination of individual suitability must precede the setting of a "uniform" parole release date. The Legislature therefore *appears* to have accepted the Board's interpretation of the statute."[16] (*Id.* at 1071, emphasis added.) If

---

[16] The case of *Tidal Oil v. Flanagan*, (1924) 263 U.S. 444 is expressly acknowledged. That case held that Art. I, § 10 only applies to state legislation, not court decisions. However, it is not contended herein that the holding in *Dannenberg* per se is retroactive legislation, but instead that if this Court's interpretation of the Legislature's intent is correct, the Legislature has in fact acted, thereby altering a law which directly impairs existing contracts. As this Court stated in

33

the Court's understanding of the Legislature's passivity is true, then the California Legislature has effectively altered the plain meaning of *Penal Code* §3041, thereby unconstitutionally abrogating the State's duty under the plea contract. Under this new interpretation, the State is no longer required to treat Mr. Pena's offense as parole eligible, and is failing to honor the agreed term of less than seventeen (17) years. Furthermore, following the Court's interpretation of the Legislature's actions, the Board has "broad" discretion to determine suitability and can effectively treat Mr. Pena's crime as a first degree murder, despite the plea agreement. This action has rendered Mr. Pena's plea agreement worthless.

This Court's ruling in *Dannenberg* does not exist in a vacuum, as literally thousands of defendants have relied on the plain meaning of § 3041. It has always been a basic premise of the plea agreement that the defendant would plead guilty in exchange for the lesser sentence, which was defined by a well established matrix, as further impacted here by the parties' understanding of a release date consistent with the minimum term. It was a further understanding that the prisoner would be paroled within the parameters of the matrix and the minimum term. To alter that basic understanding now impacts thousands of inmates who, in good faith, relied upon the plain meaning of the guiding statute and regulations. For the Legislature to alter that meaning, thus changing the terms of the contracts and removing the State's obligations under the contracts is a clear constitutional violation.

---

*Dannenberg*, it is the Legislature's failure to challenge the Board's interpretation of *Penal Code* §3041 that is a legislative act, constituting a de facto acceptance of the Board's understanding. It is this acquiescence by the Legislature which is relied on as effecting retroactive legislative action, thereby directly reducing the State's contractual obligation in violation of Art. I, §10. The plain language of *Penal Code* § 3041, as written by the Legislature clearly states that the Board of Prison Terms "*shall normally* set a parole release date" for state prison inmates serving term-to-life sentences, and must do so at the initial parole hearing. Since its enactment, twenty-nine (29) years ago, thousands of inmates have relied on the plain language of this statute when entering into plea agreements that a parole date will be set and will be proportionate to like crimes. As such, the Legislature's actions effectively amount to a *clear* constitutional violation of Mr. Pena's contract with the State, as the State is no longer required to treat his crime as parole eligible and compare the length of his sentence to other like crimes.

*PRAYER*

WHEREFORE, Petitioner Ignacio Pena respectfully requests that this Court grant review of the issues herein.

Dated: May 8, 2006                 Respectfully submitted,

                                   LAW OFFICES OF PICONE & DEFILIPPIS


                                   By:_____
                                        STEVE M. DEFILIPPIS
                                        Attorneys for Petitioner,
                                        IGNACIO PENA

35

### CERTIFICATE OF WORD COUNT

This will certify that this document contains 12,096 words.

Dated: 5/8/06

STEVE M. DEFILIPPIS, Attorney
For IGNACIO PENA

PROOF OF SERVICE BY MAIL
(1013a)  (2015.5 CCP)

STATE OF CALIFORNIA   )
                                              ) In re Ignacio P. Pena, Case No. H029497
COUNTY OF SANTA CLARA )

       I am now and at times herein mentioned have been a citizen of the United States, over the age of eighteen years, employed in Santa Clara County, California, and not a party to the within action or cause; that my business address is 625 North First Street, San Jose, California 95112; that I served copies of the:

### *PETITION FOR REVIEW*

by placing said copies in an envelope addressed to:

Court of Appeals – Sixth District
Attn: Clerk's Office
333 W. Santa Clara Street, Suite 1060
San Jose CA 95113

Superior Court-Hall Of Justice
Attn: Clerk's Office
190-200 W. Hedding Street
San Jose CA 95110

Brian Walsh
Attorney General's Office
455 Golden Gate Ave, Suite 11000
San Francisco CA 94102

Sixth District Appellate Program
100 N. Winchester Blvd, Suite 310
San Jose, CA 95050

which envelope was then sealed and, with postage fully prepaid thereon, was on May 8, 2006 deposited in the United States mail at San Jose, California; that there is delivery service by the United States mail at the place so addressed, or that there is regular communication by mail between that place of mailing and the place so addressed.

       I declare under penalty of perjury that the foregoing is true and correct.

       Executed on May 8, 2006 at San Jose, California.

                                 NAOMI CHAIREZ